IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| United States of America | ) | Case No.: 4:23-CR-00306-JD |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| | ) | |
| SHELDON JUNIOR ALEXANDER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant Sheldon Junior Alexander's ("Defendant" or "Alexander") Motion to Suppress (DE 83). On December 7, 2023, the United States of America ("Government") responded. (DE 86.) This Court held an evidentiary hearing on January 22-23, 2024, to consider Alexander's motion. The Court authorized defense counsel to file a supplemental brief. (DE 90.) After the hearing, Alexander filed a supplemental brief (DE 99), and the Government responded (DE 106). The Court has considered all the briefs and the evidence presented at the hearing, and therefore the motion is ripe for review and decision. For the reasons stated below, Defendant's motion is denied.[1]

### FACTUAL FINDINGS[2]

On the afternoon of Monday, December 19, 2022, Deputy Braxton of the Florence County Sheriff's Department ("Braxton") was conducting traffic patrol on I-95 Northbound in

---

[1] The Court notes that subsequent to the hearing, Alexander filed "Notice of Belated Discovery, or in the Alternative, A Motion to Reopen the Suppression Hearing and Provide Additional Documents" (DE 107). The Court has reviewed and considered the motion and attached exhibits in ruling on the current Motion to Suppress. However, the Court will not reopen the suppression hearing for reasons articulated in this Order. *See infra* note 4.

[2] **"In the course of deciding a motion to suppress, the district court may make findings of fact, as well as rulings of law . . . ."** United States v. Stevenson, 396 F.3d 538, 541 (4th Cir. 2005).

1

Florence County, South Carolina. At about 4:32 pm, Braxton observed a dark BMW Sports Utility Vehicle ("BMW") bearing Florida license plate QMVK58 driving approximately 80 miles per hour ("mph") in a 70 mph zone. Braxton drove to catch up with the BMW, and Braxton's dashcam recorded him traveling well in excess of 70 mph. Braxton then pulled directly behind the BMW, still traveling above 70 mph, and activated his blue lights. At 4:33 pm the BMW came to a stop off the right side of the highway. Braxton approached the passenger side of the BMW. On initial approach, Braxton noticed multiple suitcases and a duffle bag in the rear compartment of the BMW with additional bags in the front and rear seats. Braxton requested Alexander's driver's license and vehicle registration as he was the driver and sole occupant of the BMW. Alexander presented a California driver's license and indicated the car was a rental and that the rental agreement was on his phone. Braxton asked Alexander to step out of the BMW to show Braxton the rental agreement, and Alexander complied with Braxton's request. Just after Braxton made this request, he made a "25" into his radio, which is a code requesting additional deputies to respond to the scene.

Braxton then reviewed the rental agreement on Alexander's phone. According to the agreement, the vehicle had been rented at Miami International Airport in Miami, Florida, on December 16, 2022, and was due back at the Miami Airport on December 23, 2022. Braxton asked Alexander if he was still living in California; Alexander stated that he lived in Orlando, Florida, and had resided there for approximately six months. Braxton advised Alexander he should have obtained a Florida driver's license many months earlier. Braxton then told Alexander he had stopped Alexander for speeding, and Alexander admitted he was driving approximately 80 mph.

Braxton then asked Alexander where he was headed, and Alexander stated he was going to Charlotte to visit family for the weekend. Braxton asked Alexander to step to the passenger side of Braxton's patrol vehicle while Braxton started the paperwork for the stop. As Braxton entered his vehicle, he said to another responding officer, "you can bank on that one." As he worked on the paperwork for the stop, Braxton obtained Alexander's Orlando address and asked about the status of his driver's license. Braxton asked Alexander why he moved to Florida, and Alexander claimed he moved because California's COVID protocols were too strict. Alexander then explained he was perhaps moving back to California because that's where his trucking business was located. Braxton asked where in Charlotte Alexander was headed, but Alexander could not specifically identify an area of Charlotte beyond "the city." Braxton verified that Alexander was responsible for everything in the car. Braxton then asked Alexander a series of questions regarding whether there was anything illegal: guns or weapons, open containers of alcohol, narcotics, cocaine, heroin, methamphetamine, marijuana, or large amounts of currency in the BMW. Alexander responded "no, sir" to each of Braxton's questions. Braxton asked Alexander for consent to search the BMW, which Alexander denied. Braxton then stated into his radio, "run Dukat."

A certified and trained drug dog ("Dukat") handled by Deputy Rauch ("Rauch") approached the passenger side of the BMW for Dukat to conduct a free-air sniff of the vehicle. From his approach to the vehicle, Dukat showed behavior and breathing changes consistent with Dukat detecting the odor of narcotics. Dukat began working down the passenger side of the BMW and briefly placed his front paws on the front passenger window. Dukat continued towards the back of the BMW, alerting with changes of breathing and behavior to a heavy narcotics odor before continuing to the driver's side of the BMW. At the time Dukat alerted,

3

Braxton had not yet completed the stop for speeding. Dukat continued along the driver's side, apparently placing his front paws on the vehicle two more times. The entire free-air sniff lasted less than one minute.

Braxton then informed Alexander that Dukat alerted to the odor of narcotics and law enforcement was going to search the BMW. In the subsequent probable cause search of the vehicle, officers located: 1) 54 kilograms of suspected cocaine packaged into kilogram "bricks;" 2) $180,000 in United States currency; 3) a Glock 9mm handgun; and 4) multiple cellular phones. Based upon the traffic stop and additional investigation, in September, 2023, a federal grand jury sitting in the District of South Carolina returned a superseding indictment charging Alexander with: 1) possession with intent to distribute 5 kilograms or more of cocaine; 2) being an illegal alien in possession of a firearm; 3) firearm in furtherance of drug trafficking; and 4) money laundering conspiracy. (DE 40.)

## **LEGAL STANDARD**

The Fourth Amendment protects citizens against unreasonable searches and seizures. *See* U.S. Const. Amend. IV. "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions . . . .'" *Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979) (quoting *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 312 (1978)). "[S]earches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and

well delineated exceptions.'" *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations omitted).[3]

"The exclusionary rule 'generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights . . . .'" *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014) (quoting *Pennsylvania Bd. of Prob. & Parole v. Scott,* 524 U.S. 357, 359 (1998)). "[T[he exclusionary rule is not a 'strict liability regime,' and exclusion of evidence has 'always been [the] last resort, not [the] first impulse.'" *Id.* (internal citations omitted). At a suppression hearing, the Government bears the burden of proving a search or seizure did not violate the Fourth Amendment. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *Id.*

## DISCUSSION

Alexander contends the evidence should be suppressed for the following reasons: "[1] Law enforcement officers unlawfully prolonged the traffic stop without reasonable suspicion; [2] Law enforcement officers trespassed against Mr. Alexander's vehicle for the purpose of obtaining information; and [3] The dog deployed to Mr. Alexander's vehicle failed to alert and the dog lacked training and reliability." (DE 83, p. 1; DE 106, p. 1.) The Court disagrees with each reason.

1. Prolonging of the Stop

---

[3] Examples of well-established exceptions include, but are not limited to, the exigent circumstances exception, *Mincey v. Arizona,* 437 U.S. 385, 394, (1978), the search incident to arrest exception, *United States v. Robinson,* 414 U.S. 218, 224 (1973), the automobile exception, *Maryland v. Dyson,* 527 U.S. 465, 466, (1999), the stop and frisk exception, *Terry v. Ohio*, 392 U.S. 1 (1968), the consent exception, *Fla. v. Jimeno*, 500 U.S. 248, 250–51 (1991), and the "plain-view" doctrine, *United States v. Legg*, 18 F.3d 240, 242 (4th Cir. 1994).

Alexander contends the initial stop was unlawfully prolonged and lacked reasonable suspicion, in violation of his Fourth Amendment rights. (*See* DE 83, p. 3; DE 99, p. 1.) The Court disagrees. "It is well established that the '[t]emporary detention of individuals during the stop of an automobile by the police ... constitutes a 'seizure,' no matter how brief the detention or how limited its purpose." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (citations omitted). But "[b]ecause an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest, we analyze the propriety of a traffic stop using the dual inquiry announced in the Supreme Court's holding in *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014).

That inquiry asks, "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. First, Alexander contends Deputy Braxton did not have justification to initiate the stop for speeding in part because the initial stop was pretextual. (*See* DE 99, p. 2.) The Court disagrees. "Observing a traffic violation provides sufficient justification to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *Branch*, 537 F.3d at 335. Further, whether "[a] traffic stop is reasonable . . . is an objective standard. The standard is met, therefore, when officers observe a traffic violation, regardless of their true, subjective motives for stopping the vehicle. *See United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2013) (internal citations omitted). Here, Braxton observed Alexander moving above the posted speed limit, an assessment he based on his on-the-job training in traffic enforcement and his visual estimation of how Alexander's vehicle was moving compared with other traffic and with stationary landmarks. (*See* DE 94 at 65; DE 98 at 28-29.) Braxton then used the pacing method to establish the speed Alexander was moving

6

which was captured on his dash cam and showed Alexander was moving at a speed in excess of the 70 miles per hour speed limit. (*See* DE 94 at 66, 69-70; Gov't Ex. 1); s*ee also United States v. Sowards*, 690 F.3d 583, 592 (4th Cir. 2012) ("The reasonableness of an officer's visual estimate that a vehicle is traveling in slight excess of the legal speed limit may be supported by radar, *pacing methods*, or other indicia of reliability that establish, in the totality of the circumstances, the reasonableness of the officer's visual speed estimate." (emphasis added)). Thus, regardless of any pretextual motives, Braxton observed a traffic violation, so the initial stop was reasonable.[4]

As to the second part of the inquiry regarding the scope of the officer's actions, "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal and external citations omitted). Alexander cites to numerous points during the stop and Braxton's subsequent processing of a ticket where Alexander claims the stop was delayed. (*See* DE 99, pp. 5-7.) Alexander articulates each delay by the second, and for efficiency, the Court groups the alleged delays and will reference them hereafter as follows:

---

[4] Subsequent to the hearing, Alexander filed a "Notice of Belated Discovery, or in the Alternative, a Motion to Reopen the Suppression Hearing and Provide Additional Documents" (DE 107). In that motion, Alexander puts forth evidence disclosed to him after the hearing that he contends: (1) supports the pre-textual nature of the stop and (2) attacks Braxton's credibility. The Court has reviewed and considered the evidence in ruling on this motion. However, the Court declines to reopen the suppression hearing based on this evidence. A suppression hearing may be reopened if a defendant establishes the government withheld evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). *See United States v. McCoy*, 348 F. App'x 900, 902 (4th Cir. 2009). "To establish a *Brady* violation, a defendant must show that the new evidence was (1) favorable to him for exculpatory or impeachment purposes; (2) that it was intentionally or unintentionally withheld by the Government; and (3) that the evidence was material." *Id.* (citing *Strickler v. Greene,* 527 U.S. 263, 282 (1999); *Moseley v. Branker,* 550 F.3d 312, 318 (4th Cir. 2008)). Here, the evidence Alexander contends was improperly withheld was not material to this ruling. First, evidence supporting the pre-textual nature of the stop is immaterial to this ruling – as previously held, the initial stop was justified at inception because Alexander was observed speeding. Second, the Court has considered the evidence in determining the credibility of Braxton's testimony in this ruling. Accordingly, Alexander's motion (DE 107) is denied.

(1): Braxton BWC at 16:35:43-16:36:17; 16:36:36-16:37:40 – Alexander contends "Deputy Braxton spent the majority of his time questioning Mr. Alexander about where he lives, his travel plans, his reasons for travelling, where he was originally from, and the type of work he did." (DE 99, p. 5.) Alexander was also asked to exit his vehicle.

(2) Braxton BWC at 16:40:09-16:4:22; 16:40:58-16:41:05 – Alexander contends "During these times, Deputy Braxton stops entering information into the warning ticket form solely to engage Mr. Alexander in further questions about his travel plans and other information unrelated to the stop." (*Id.*)

(3) Braxton BWC at 16:41:06-16:41:51; 16:42:01-16:42:13 – Alexander contends "After, Deputy Braxton notes the moving violation, he scrolls to the final portion of the warning ticket on his screen. Rather than make any progress toward the traffic stop, he spends nearly a full minute asking Mr. Alexander numerous questions about what might be in the car, about who has responsibility for the car, about various types of drugs, about currency, and various other investigative questions. Deputy Braxton later asks for consent to search the car. When consent is denied, he calls for Deputy Rauch to run the canine and waits before clicking the last button necessary to complete the warning ticket." (*Id.*)

(4) Braxton BWC at 16:42:13-16:42:45; 16:43:02-16:43:43; Dash Cam at 16:43:02-16:43:43 – Alexander contends "Deputy Braxton completes all the required information for the warning ticket, to include clicking all boxes. The canine sniff is ongoing but not complete. Deputy Braxton waits another 30 seconds before even beginning the process of running Mr. Alexander's driver's license. Deputy Braxton waits in the car, with Mr. Alexander flanked by officers, while the canine sniff continues. The canine allegedly alerts when it is behind the car some 41 seconds later (although Mr. Alexander is told to place his hands behind is back an additional 34 seconds later)." (*Id.* at 6.)

As to Groups 1 and 2, the Court disagrees with Alexander's characterization of Braxton's actions; rather, Braxton's actions were consistent with ordinary inquiries and actions of a traffic stop or related safety concerns. *See Rodriguez v. United States*, 575 U.S. at 355 (Among other things, "ordinary inquiries incident to [the traffic] stop," include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). Further, Braxton was authorized to ask Alexander to exit the vehicle. *See Ohio v. Robinette*, 519 U.S. 33, 38–39, (1996) (citing *Pennsylvania v. Mimms,* 434 U.S. 106, 111, n. 6 (1977) ("[O]nce a motor vehicle has been

lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.")

As to Groups 3 and 4 of Alexander's alleged unconstitutional delays, these inquires occurred after Braxton had reasonable suspicion of drug trafficking. "A lawful traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete [the] mission' of issuing a warning ticket." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018). But "[w]here the occupants of a vehicle are detained beyond the scope of a routine traffic stop, the officer must be able to articulate reasonable suspicion that criminal activity is afoot." *United States v. Brugal*, 209 F.3d 353, 357 (4th Cir. 2000) (quoting *Terry*, 392 U.S. at 30). "A reasonable suspicion exists when law enforcement officers possess 'a particularized and objective basis for suspecting the person stopped of criminal activity.'" *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) (quoting *Ornelas v. United States,* 517 U.S. 690, 696). Thus, "[a] reasonable suspicion is demonstrated when an officer is able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2012).

The Government contends, "by four-and-a-half minutes into the stop, Braxton had observed [numerous] factors, each of which distinguished Alexander from the innocent motoring public and each of which suggested to Braxton, based upon his extensive training and experience in criminal interdiction, that drug trafficking was afoot." (DE 8, p. 20.) Although the Court does not agree that every factor articulated by the Government supports Braxton's reasonable suspicion, the Court finds the following factors are sufficient: (1) Alexander had a California

driver's license, reported he had been living in Orlando for six months, but had rented the BMW in Miami (*see* DE 94 at 73, 75-78, 81-82); (2) Alexander claimed he was headed to Charlotte for the weekend but the car was due back in Miami before the end of the weekend (*id.* at 75-76); (3) Alexander was stopped on the well-known drug corridor of I-95 Northbound in Florence County, more than an hour off route from where the typical motorist would be traveling from Florida to Charlotte (*id.* at 81-82); and (4) Alexander had a large amount of luggage in the car considering Alexander's short weekend travel plans, which was consistent with a "trafficking turnaround" trip (*id.* at 72, 78-80). "In reviewing police action, courts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" *United States v. Bowman*, 884 F.3d at 213 (quoting *United States v. Branch*, 537 F.3d at 336-37). The Court is persuaded these factors taken in isolation are marginal at best to move the reasonable suspicion meter. But, taken as a whole and *coupled* with the practical experience of officers who observe drug trafficking methods, these factors "eliminate a substantial portion of innocent travelers." *United States v. Williams* 808 F.3d 238, 246 (4th Cir. 2015).

Thus, the alleged delays in Groups 3 and 4 occurred after Braxton had reasonable suspicion of drug trafficking, and therefore Alexander's detention "beyond the scope of a routine traffic stop" was constitutional. *See United States v. Brugal*, 209 F.3d at 357. Further, Alexander's contention that the free-air dog sniff unconstitutionally prolonged the stop is equally rejected because the dog sniff also occurred after Braxton obtained reasonable suspicion of drug trafficking. *See United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017) (a "sniff . . . may not prolong the duration of the traffic stop *absent* consent of those detained or reasonable suspicion

of criminal activity" (emphasis added)).  Finally, "when following up on the initial reasons for a traffic stop, the officer must employ 'the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time.'"  *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) (citation omitted).  "To be clear, the law does not require that the officer employ the least intrusive means conceivable."  *Id.*  Here, Braxton used the least intrusive means available – he asked questions related to drug trafficking, he asked for Alexander's consent to search his vehicle to verify or dispel his suspicion, and, after Alexander refused, Braxton immediately deployed the dog sniff.  (*See* Gov't Ex. 2 at 16:42:01.)  In sum, the initial stop "was justified at its inception," *Terry*, 392 U.S. at 20, Braxton had reasonable suspicion that Alexandar was engaged in drug trafficking to detain him "beyond the scope of a routine traffic stop," *United States v. Brugal*, 209 F.3d at 357, and he used "the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time." *United States v. Palmer*, 820 F.3d at 649.

   2. **Trespass**

Alexander contends an unconstitutional search occurred "when Dukat, while being handled by Deputy Rauch, twice jumped onto Mr. Alexander's vehicle.  This allowed the dog to sniff the upper seams and where the window had recently been cracked open."  (DE 83, p. 9.)  The Government opposes this contention arguing, even if "[a]ssuming *arguendo* Dukat trespassed by placing his paws on the exterior passenger side of the BMW, law enforcement would nonetheless have inevitably discovered the evidence in and derived from the search of the BMW." (DE 86, p. 17.)  The Court agrees with the Government.  Under the Fourth Amendment, officers must have probable cause to effectuate a warrantless search.  *See* U.S. Const. amend. IV. Although typically a "dog sniff is not a search within the meaning of the Fourth Amendment,"

*United States v. Branch*, 537 F.3d at 335–36, if "'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred,'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 (2012)). "It is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment." *Jones*, 565 U.S. at 412. (citing *United States v. Chadwick*, 433 U.S. 1, 12, (1977)). But under the "inevitable-discovery doctrine," the government may "use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

At the hearing, Officer Rauch testified that he saw Dukat alert as they initially approached the vehicle, before Dukat put his paws on the BMW, stating, "I could have called [the alert] when we [were] coming up the hill . . . . [Dukat] was in narcotics odor at that time." (DE 98, pp. 95, 113.) "[T]he detection of narcotics by a trained dog is generally sufficient to establish probable cause." *United States v. Koon Chung Wu*, 217 F. App'x 240, 245 (4th Cir. 2007) (quoting *United States v. Robinson,* 707 F.2d 811, 815 (4th Cir. 1983)). Thus, before Dukat placed his paws on Alexander's vehicle, officers had probable cause to search the vehicle. Accordingly, absent Dukat placing his paws on the vehicle, Rauch has shown by the preponderance of the evidence that officers would have inevitably found the evidence Alexander now seeks to suppress.

### 3. Dukat's alert, training, and reliability

Alexander first contends Dukat failed to alert. The Court disagrees. Although no binding precedent establishes the proper "alert" standard for a drug detection dog, whether a dog alert is

a question of fact for this court to resolve. *See United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010). Here, the Government presented sufficient evidence at the hearing to support that Dukat alerted to the BMW for the odor of narcotics. (*See* DE 98 at 103-06, 113-14 (Dukat's change in behavior and breathing as soon as he and Rauch began coming up the hill towards the vehicle); DE 94 at 43, DE 98 at 95 (Rauch as Dukat's handler, is the individual qualified to call the alert because he knows how to read Dukat).)

Next, Alexander contends Dukat is not properly trained and is unreliable. (DE 83, p. 11; DE 99, p. 13.) The Court again disagrees. The Supreme Court has laid out some basic principles regarding the reliability of drug dogs:

> Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

*Fla. v. Harris*, 568 U.S. 237, 247, 133 (2013). The Government has provided ample evidence supporting the adequate training and reliability of Dukat and Rauch as his handler. They were trained and certified at Ventosa Kennels (*see* DE 94 at 45-46; Gov't Exs. 10, 11), which included a 120-hour course with classes for Rauch covering how scent works and learning one's K-9 and an extensive field component for Rauch and Dukat including multiple searches of buildings and vehicles for the odor of narcotics (*see* DE 94 at 38-39; DE 98 at 74). Following training, Ventosa's certification process included a written test on which Rauch had to score at least 80

and a field test involving sixteen hides of different narcotics odors in a variety of settings on which the team had to score 100 percent. *See* DE 94 at 39-42.

Following their Ventosa training and certification, Dukat and Rauch have maintained their skills with at least sixteen hours per month of training – that included multiple controlled-environment searches for narcotics odor and the use of distractors and blanks. (*See* DE 98 at 81-84; Gov't Ex. 8.) Seven months after their initial certification, in May 2022, Dukat and Rauch were recertified as a narcotics-detection team by Rivera, a Master Trainer with the American Police Canine Association ("APCA"). (*See* DE 95 at 46-47, 62.) APCA's certification involves multiple hides of different kinds of narcotics in various locations with very high standards; blanks are a required part of the certification testing. (*See* DE 95 at 10-12.) Dukat and Rauch passed their APCA certification and were certified; that certification was valid for one year, including on the date of the stop at issue in this case. (*Id.* at 12-19; Gov't Exs. 13, 14.) Dukat and Rauch were further recertified by APCA as a narcotics-detection team in 2023. (*See* DE 95 at 20.) Thus, the Court finds that Dukat and Rauch were properly trained and reliable.

## CONCLUSION

For these reasons, Alexander's Motion to Suppress (DE 83) the evidence in the charges pending against him is **DENIED**.

**IT IS SO ORDERED.**

May 20, 2024
Florence, South Carolina

Joseph Dawson, III
United States District Judge